## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MIKHAIL HAYNES,** | : | |
| | : | **Civil Action No. 1:09-CV-450** |
| **Plaintiff,** | : | |
| | : | **(Judge Conner)** |
| v. | : | |
| | : | **(Magistrate Judge Carlson)** |
| **AT&T MOBILITY, LLC, f/k/a** | : | |
| **CINGULAR WIRELESS, LLC,** | : | |
| | : | |
| **Defendants.** | : | |

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

Mikhail Haynes commenced this action on March 11, 2009, against his former employer, AT&T Mobility, LLC (hereinafter "AT&T" or "Defendant"), alleging that Defendant discriminated and retaliated against him in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C.A. § 12101 *et seq.* Plaintiff has also brought related state law claims under the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq.* Now pending before the Court is Defendant's motion for summary judgment filed on December 17, 2009. (Doc.15.) This motion was then referred to the Court for our consideration on June 21, 2010. (Doc. 26.) For the reasons that follow, it is recommended that Defendant's Motion be granted in part and denied in part.

## II.  **BACKGROUND**[1]

Plaintiff is an adult male suffering from acquired immune deficiency syndrome ("AIDS"), which developed after he was diagnosed with the human immunodeficiency virus ("HIV") in 1985.  The disease and the medications taken to treat the disease cause Plaintiff to suffer from a suppressed immune system and myriad other symptoms that can occur or manifest at any time with or without warning.  These symptoms include, but are not limited to, frequent and sudden urges to use the bathroom, muscular atrophy, chronic fatigue, cognitive impairment, and nausea.

Plaintiff began employment as a Customer Service Representative for an AT&T Mobility predecessor in or around November, 2000, at the Atwater, California Call Center.  In an effort to move to a more temperate climate, Plaintiff requested, and was granted, a transfer to the AT&T Mobility Call Center in Harrisburg, Pennsylvania.  Plaintiff began working at the Harrisburg Call Center on or about September 19, 2006.  As a Customer Service Representative, Plaintiff was

---

[1] The facts recited in this report are taken from the complaint as well as Defendant's Statement of Facts to the extent they are not disputed.  Also of note, most documents referred to and relied upon by Plaintiff are the same documents relied upon and submitted as appendices to Defendant's Statement of Facts and Brief.

responsible for answering phones and working on a computer to assist customers with inquiries they may have.

Due to his illnesses, Plaintiff required several accommodations so that he could perform his job duties. Plaintiff's original ADA Medical Inquiry sheet, completed by Dr. Alan Nassar, outlined several required accommodations. (Exhibit "B" to Defendant's Statement of Undisputed Facts) (hereinafter "SUF"). Due to a rigid medicine schedule, Plaintiff's work day was adjusted so that he could take his medication with a meal during short, scheduled break times, and he was permitted to leave at 5:30 pm everyday so that he could arrive at home in time to take his medication at 6:00 again with a meal. Also to accommodate his medical regimen, Plaintiff was scheduled to have Sunday and Monday off consecutively so that he could recuperate from the work week and so that he could meet with doctors on one of his days off, if needed. To accommodate his muscular atrophy, Plaintiff was provided with a moveable desk that would allow him to stand while working, and Plaintiff was provided an ergonomical keyboard and mouse to accommodate his carpal tunnel syndrome.

During his work for AT&T at the Atwater Call Center in California, Plaintiff received these accommodations with little trouble. However, after transferring to Harrisburg, Plaintiff experienced some difficulty in receiving some of his requested

accommodations from AT&T. Plaintiff maintains that for more than a month, he was not provided with his keyboard and mouse, despite the items arriving from California soon after he began employment. Plaintiff also claims that he was never provided with an acceptable moveable desk, despite numerous requests for either his motorized desk from California to be shipped or a similar desk to be purchased for his use.[2] Instead of the motorized desk, Defendant provided Plaintiff with an extendable desk tray, though Plaintiff contends that the tray was broken and did not allow him to stand due to height restrictions and proximity to another CSR seated behind him. (SUF, Ex. A, Haynes Dep. pp. 109-10).

Due to his disabilities, Plaintiff also sought seating that would place him close enough to the bathroom that he could walk to the bathroom without soiling himself when sudden urges to use the restroom struck him. Plaintiff testified that, while in the Harrisburg Call Center, he was seated too far from the bathroom and, as a result, soiled himself several times.[3] During his time at the Harrisburg Call Center, Plaintiff

_____

[2] The parties offer differing explanations as to why Plaintiff's desk, or one like it, was not provided. Plaintiff maintains that the Senior Human Resource Manager, Mr. Kyle Mundis, refused to have the desk shipped to Harrisburg, while Defendant insists that the Atwater Call Center refused to ship the desk. It does appear undisputed that a moveable workstation was made available to Plaintiff, but he liked it less well than the motorized model that he used in California.

[3]The parties dispute what specific accommodation Plaintiff needed with regard to his restroom proximity. The record indicates that the only advice

spoke to several supervisors about his need to move to a desk closer to the bathroom. (SUF, Ex. A, Haynes Dep. pp. 126-28). During bidding for shifts, Plaintiff, per his supervisors' instructions, bid to work on a team that was located close enough to a bathroom that he would not have problems soiling himself. (SUF, Ex. A, Haynes Dep. pp. 128-29). However, when Plaintiff began work with the team that he thought would be close enough to the bathroom, he found that the team had been moved to a location further away from the bathroom than where his previous team had been located. Id. Nevertheless, when Defendant sought further clarification from Plaintiff about exactly where he believed he needed to be placed in proximity to a restroom, he failed to give further guidance. (SUF ¶ 35.)

In December, 2006, approximately three months after he began working at the Harrisburg Call Center, Plaintiff presented Defendant with a medical evaluation from Dr. John Goldman, a Pennsylvania physician, in which Dr. Goldman indicated that

---

provided to Defendant with respect to proximity is that Plaintiff be placed close enough to a bathroom to avoid accidents, but not so close as to cause him embarrassment. (SUF ¶ 33.) The record is devoid of evidence to show precisely how far Plaintiff or his doctors believed he needed to be situated in order to have adequate ability to reach the restroom as needed. Indeed, Kyle Mundis, the Senior Human Resources Manager of the Harrisburg Call Center, requested that Plaintiff provide more specificity regarding this particular requested accommodation, but Plaintiff – apparently believing it was unfair of Mundis to make such a request – declined to provide any further documentation in support of his desired proximity to the restroom. (SUF ¶ 35.)

Plaintiff needed a less stressful job environment than the one he faced in the Harrisburg Call Center in order to accommodate his medical needs. This medical evaluation was provided to Michelle Grounds, Defendant's Return to Work Manager, who subsequently sent the evaluation out for "peer review" by another physician affiliated with a third-party vendor with which AT&T Mobility contracted in order to clarify Dr. Goldman's recommendation regarding Plaintiff being accommodated with a "less stressful" position. (SUF ¶ 40.) It appears that during the peer review process, third-party physicians consult with the employee's treating physician and review the employee's job description in order to determine whether the employee is capable of performing the essential functions of his job with or without reasonable accommodation.

In the first peer review that AT&T Mobility obtained, the reviewing physician, Dr. Raymond Chagnon, opined on December 29, 2006, that:

> The available medical evidence does not support that Mr. Haynes would be unable to perform the CRS position due to stress. He is doing the job and is not having any difficulty doing the job and so as long as the stress of his job does not increase from what it is at this time, he would be fully able to do the job functions of a CSR.

(SUF ¶ 41; SUF, Ex. J.) Although this peer review appears to conclude that Mr. Haynes was capable of performing his job duties, several months later, Michele

Grounds determined that a second peer review was warranted.[4] (SUF ¶ 42.) Ms. Grounds attested that AT&T Mobility elected to obtain a second peer review, perhaps pursuant to advice from in-house counsel, and also from a request by Kyle Mundis, in an effort to determine whether transfer out of the Harrisburg Call Center was deemed medically necessary. (SUF, Ex. E, Dep. of Michele Grounds at 59.) Ms. Grounds testified somewhat haltingly as follows about how the determination was made to request a follow up peer review: "you know, define it; is [Mr. Haynes] telling us to send him to a different job, is he telling us to send him – he can't do the customer service job; is he – again this question here is very important because it's due to necessity or convenience. This was us trying to understand the stress situation." (SUF, Ex. E, Grounds Dep. at 59.) Ms. Grounds also appeared to testify that the second peer review inquiry was motivated, in part, by AT&T Mobility's understanding that Plaintiff was interested in transferring to a retail job. (SUF, Ex. E, Grounds Dep. at 60.)

In this second peer review, dated April 26, 2007, Dr. Neal Sherman with MLS National Medical Evaluation Services, Inc., opined that Plaintiff "needs to be in a less stressful work situation, not only due to his physical limitations, but also because of

_____

[4] In her deposition, Ms. Grounds could not recall whether she shared with Mr. Haynes a copy of Dr. Chagnon's assessment. (SUF, Ex. E, Grounds Dep. at 57.)

current problems with memory impairment." (SUF ¶ 43; SUF, Ex. K.)  In addition,

Dr. Sherman, in consultation with Plaintiff's other physicians, concluded that it was

"medically necessary" – rather than a matter of mere "convenience" – to transfer

Plaintiff out of the Harrisburg Call Center, because such a transfer was expected to

"reduce the level of stress in this individual's daily activities which has an adverse

effect upon his medical condition."  (SUF, Ex. K.)[5]  Notwithstanding this

recommendation, and the earlier review by Dr. Chagnon, Defendant seems to have

distilled the medical reviews received regarding Mr. Haynes to the following

conclusion:  "none of the medical evaluations submitted to AT&T Mobility stated

that Plaintiff was unable to perform the essential functions of his CSR position with

or without reasonable accommodation."  (SUF ¶ 48.)

Apparently some time after Dr. Sherman had furnished Ms. Grounds with his

peer review recommending a medically necessary transfer of Mr. Haynes to a less

stressful work environment out of the call center, Plaintiff made a request to Kyle

---

[5]  Defendant suggests that it is "notable" that Dr. John Goldman – the first
doctor to opine that Plaintiff required a "less stressful" work environment –
commented to Dr. Sherman that "he would personally be reluctant to employ Mr.
Haynes because of the claimant's impaired cognition, easy fatigability, and
stressful response to the work environment."  (SUF ¶ 44; SUF, Ex. K.)  It is not
clear what, if any, relevance Dr. Goldman's personal hiring inclinations may have
been with respect to Plaintiff's efforts to obtain accommodations for a job in
which he was already employed.

Mundis that he be transferred to a retail position, apparently under the impression that such a job would be less stressful and aggravating to his medical condition than his job in the call center. (SUF, Ex. D, Mundis Dep. at 55.) It is not clear from the record whether immediately after making this request Plaintiff actively sought out a retail or other job within the company. It also appears that during this time, Plaintiff continued to work in his job in the call center.

In December 2007, Dr. Goldman – the doctor who had originally opined in November, 2006, that Plaintiff needed a "less stressful" environment to accommodate his medical needs – submitted an updated medical evaluation to AT&T Mobility regarding Mr. Haynes's condition and accommodations that may have been beneficial or necessary. (SUF, Ex. L.) Specifically, Dr. Goldman suggested that Plaintiff be reassigned to a position that did not require him to continually answer customer telephone calls and that did not leave him subject to continual performance review. (Id.) In his updated report, Mr. Goldman expressed his medical opinion that Plaintiff would "have less stress in a job that does not require handling incoming calls" and placement in a job without this requirement "would be medically beneficial." (Id. ¶ 9.) Dr. Goldman also included a number of other suggested accommodations, many of which it appears had already been extended to Plaintiff, including: the use of an adjustable desk, a separated keyboard, and an ergonomic mouse; placement at a desk

close to the restroom; the ability to adjust computer monitors to help him read text; adherence to regular hours to accommodate predictable meal times; and minimal overtime. (Id. at ¶ 7.)

Sometime after this evaluation, apparently without consulting Plaintiff about the peer reviews and medical opinions that AT&T Mobility obtained, members of Defendant's human resources and legal staff concluded that Plaintiff could no longer perform the essential functions of his job even with the accommodations that had already been made for him. (SUF ¶¶ 61-64.) On or about January 22, 2008, Plaintiff met with Senior Human Resources Manager Kyle Mundis, who informed Plaintiff that, pursuant to Defendant's ADA Accommodation Best Practices Policy, he was being placed on a thirty-day paid job search while he attempted to locate and apply for a more suitable position within the company. Effective as of this date, Plaintiff was no longer permitted to perform his work in the call center, and, in fact, was not permitted to be in the call center. During this thirty-day period, Plaintiff applied for a number of positions with Defendant, but was not offered any of them.[6] Plaintiff maintains, somewhat speculatively, that the failure to hire him stemmed from some

---

[6] The exact number of positions to which Plaintiff applied is unclear, but it is clear that Plaintiff made a significant, concerted effort to find and apply for suitable employment with Defendant and was not hired to any of the positions to which he applied.

animus from Mundis, whereas Defendant insists that Plaintiff was not hired because he was not the most qualified applicant to any position, and Defendant had a policy of hiring the most qualified applicant for all positions. (Mundis Dep. p. 66 at 6-9, 17-21.)

After the thirty-day period expired, Plaintiff was placed on an additional thirty-day unpaid job search period. After expiration of the second period, in which Plaintiff was unsuccessful in finding another position with the company, Defendant terminated Plaintiff's employment.

Plaintiff filed a timely claim with the Equal Employment Opportunity Commission, which subsequently conducted an investigation, and later issued Plaintiff a right-to-sue letter. Thereafter, Plaintiff timely commenced the instant action by filing a complaint alleging discrimination and retaliation in violation of the ADA. Following the close of the pleadings and discovery, Defendant moved for summary judgment. (Doc. 15.) The motion has been fully briefed, (Docs. 16, 17, 18, 19, 20, 23) and is ripe for disposition.

## III. __STANDARD OF REVIEW__

AT&T has moved for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, which provides that "[t]he judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any

affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also appropriate if

12

the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. Id. at 252; see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

## IV. DISCUSSION

### A. Failure to Accommodate

Plaintiff claims that Defendant unlawfully discriminated against him by failing to provide him with reasonable accommodations for his disabilities in violation of the ADA. The ADA provides that "[n]o covered entity shall discriminate against a qualified employee on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is defined by the ADA as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A "disability" is defined as "(A) a physical or

mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(a).

In consideration of the foregoing, the United States Court of Appeals for the Third Circuit has held that in order for a plaintiff to establish a *prima facie* case of workplace discrimination under the ADA, the plaintiff must show: (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination.  Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999) (quoting Gaul v. Lucent Technologies, 134 F.3d 576, 580 (3d Cir. 1998) (citing Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir. 1996)).  Adverse employment decisions in this context include refusing to make reasonable accommodations for a plaintiff's disabilities. The ADA specifically provides that an employer "discriminates" against a qualified individual with a disability when the employer does "'not make reasonable accommodations to the known physical or mental limitations of the individual unless the [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer].'"  Taylor, 184 F.3d at 306 (quoting 42 U.S.C. § 12112(b)(5)(A)).  "Reasonable accommodation" further

"includes the employer's reasonable efforts to assist the employee and to communicate with the employee in good faith," Mengine v. Runyon, 114 F.3d 415, 416 (3d Cir. 1997), under what has been termed a duty to engage in the "interactive process," which we will address in further detail below. Generally, the question of whether a proposed accommodation is reasonable is a question of fact. See Buskirk v. Apollo Metals, 307 F.3d 160, 170-71 (3d Cir. 2002) (citing Hovsons, Inc. v. Township of Brick, 89 F.3d 1096, 1101 (3d Cir. 1996)).

The ADA specifically defines the term "discriminate" to include "not making a reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). The ADA states that "reasonable accommodation" may include "job restructuring . . . *reassignment to a vacant position*, acquisition or modification of equipment or devices, appropriate adjustment or modification of examinations[.]" 42 U.S.C. § 12111(9)(B) (emphasis added); see also Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 768-769 (3d Cir. 2004) (specifically addressing reassignment as one form of reasonable accommodation recognized under the ADA). However, the EEOC's commentary to its regulations provides that reassignment

"should be considered only when accommodation within the individual's current position would pose an undue hardship." EEOC Interpretive Guidance, 29 C.F.R. Pt. 1630, App. § 1630.2(o).

With respect to accommodating a qualified employee who has a disability, the Third Circuit explained that under the ADA employers must engage in an "interactive process" to determine what specific accommodations are necessary for the employee to perform the essential functions of her job. Mengine v. Runyon, 114 F.3d 415, 419-21 (3d Cir. 1997) (discussing the duty in the context of the Rehabilitation Act).[7] The Third Circuit expanded upon this analysis in subsequent cases. See Taylor, 184 F.3d at 312-13; see also Donahue v. Consolidated Rail Corp, 224 F.3d 226, 230 (3d Cir. 2000). Both employer and employee "have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith." Mengine, 114 F.3d at 420, 114 F.3d at 420. In Taylor, the Third Circuit held that the interactive process must include sufficient notice to inform the employer that an employee is requesting an accommodation followed by good faith participation of the employer and employee in that interactive process. 184 F.3d 296, 319-20 (3d Cir. 1999). "The purpose of the interactive process is to determine the appropriate accommodations:

---

[7] Mengine involved the interactive process implicated under the Rehabilitation Act, but the discussion applies with equal force to accommodations under the ADA. See Taylor v. Phoenixville Sch. Dist., 184 F.3d at 312, n.5.

'this process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations.'" Id. at 316. "When the interactive process works well, it furthers the purposes of the . . . ADA." Mengine, 114 F.3d at 420. In another case, the circuit commented that the interactive process required under the ADA "may, in fact, not only lead to identifying a specific accommodation that will allow a disabled employee to continue to function as a dignified and valued employee, it may also help sensitize the employer to the needs and worth of the disabled person. It, therefore, furthers the interest of the employer, and the dignity and humanity of the disabled employee." Conneen v. MBNA Am. Bank, N.A., 334 F.3d 318, 331 (3d Cir. 2003).

An employee can demonstrate that an employer breached its duty to provide reasonable accommodations because it failed to engage in good faith in the interactive process by showing that: (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith. Id. (citing Taylor, 184 F.3d at 319-20). At the same time, in a case addressing an employee's claim that an employer failed to engage in the interactive process, the Third Circuit also made clear that a "plaintiff

in a disability discrimination case who claims that the defendant engaged in discrimination by failing to make a reasonable accommodation cannot recover without showing that a reasonable accommodation was possible." Donahue, 224 F.3d at 234. Thus, "'because employers have a duty to help the disabled employee devise accommodations, an employer who acts in bad faith in the interactive process will be liable if the jury can reasonably conclude that the employee would have been able to perform the job with accommodations.'" Id. at 234-35 (quoting Taylor, 184 F.3d at 317).

### 1. Transfer to a vacant position

Plaintiff has claimed that Defendant unlawfully discriminated against him in violation of the ADA by refusing to transfer him to a vacant position as a reasonable accommodation for his disabilities. There appears to be no dispute in the record that Plaintiff sought to identify jobs within the company, outside of the call center where he would not have to answer telephone inquiries from customers, in an effort to find a suitable reassignment. It is also undisputed that, despite his efforts, Plaintiff was not offered employment in any of the positions for which he applied. Defendant does not deny that Plaintiff was not hired, but contends that it had no obligation to reassign Plaintiff to another position, but was, if anything, merely obligated to permit Plaintiff to apply for other jobs on the same footing as any other applicant. Defendant

contends that Plaintiff was not hired for any other position because he was not the most qualified applicant, and Defendant claims it is entitled to summary judgment because being forced to transfer Plaintiff to a vacant position would violate the company's policy of hiring only the most qualified applicant for open positions.

The key legal issue, and the issue to which the parties devote the majority of their briefs, requires that we consider whether and when the ADA, as part of a reasonable accommodation process, may compel an employer to reassign a disabled employee to a vacant position in favor of other candidates, better qualified or otherwise. Review of the ADA and precedential authority expose an unsettled area of the law that has inspired considerable disagreement among the various circuit courts that have considered the issue of whether an employer is obligated to reassign a disabled employee to a vacant position in order to accommodate an employee's medical needs, even where the employee may not be the most qualified applicant.

In Shapiro v. Township of Lakewood, 292 F.3d 356, 361 (3d Cir. 2002), the Third Circuit held that in a failure-to-transfer case, "the plaintiff bears the burden of demonstrating: (1) that there was a vacant, funded position; (2) that the position was at or below the level of the plaintiff's former job; and (3) that the plaintiff was qualified to perform the essential duties of this job with reasonable accommodation." 292 F.3d at 360. If a plaintiff satisfies this threshold tripartite burden, the Third

Circuit, interpreting the Supreme Court's opinion in U.S. Airways, Inc. v. Barnett, 535 U.S. 391 (2002), articulated the applicable two-step approach to apply when considering whether a requested accommodation of reassignment is violative of a claimed disability-neutral rule of the employer:

> The first step requires the employee to show that an accommodation is a type that is reasonable in the run of cases. The second step varies depending on the outcome of the first step. If the accommodation is shown to be a type of accommodation that is reasonable in the run of cases, the burden shifts to the employer to show that granting the accommodation would impose an undue hardship under the particular circumstances of the case. On the other hand, if the accommodation is not shown to be a type of accommodation that is reasonable in the run of cases, the employee can still prevail by showing that special circumstances warrant a finding that the accommodation is reasonable under the particular circumstances of the case.

Id. As such, we must determine whether a reassignment is a type of accommodation that is reasonable in the "run of cases." Id. Defendant presents no substantial argument that transfer is not reasonable "in the run of cases," and we observe that at least one other court within the Third Circuit has found that transfer to a vacant position appears to be a reasonable accommodation "in the run of cases." See Tish v. Magee-Women's Hosp., No. 2:06-cv-820, 2008 U.S. Dist. LEXIS 87010, at *56 (W.D. Pa. Oct. 27, 2008). Likewise, the Third Circuit has had occasion to note that

reassignment may, in some circumstances, be a reasonable accommodation under the ADA. See Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 768-769 (3d Cir. 2004) (specifically addressing reassignment as one form of reasonable accommodation recognized under the ADA). Moreover, we are mindful that the reasonableness of a particular accommodation is, in general, a question of fact. See Williams, 380 F.3d at 771; Buskirk v. Apollo Metals, 307 F.3d 160, 170-71 (3d Cir. 2002) (citing Hovsons, Inc. v. Township of Brick, 89 F.3d 1096, 1101 (3d Cir. 1996)).

Regardless of whether reassignment may or may not be reasonable in some cases, Defendant's position appears to be two-fold: (1) it was not obligated to override its policy of hiring only the most qualified applicants in order to reassign Plaintiff to another vacant position, perhaps at a retail location or in another capacity; and (2) Plaintiff's requested accommodation to be reassigned to a job that would be less stressful is, as a matter of law, not reasonable under Third Circuit law. We will address these contentions separately.

### a. Reassignment as a Reasonable Accommodation

The circuit courts are divided on the issue of whether a disabled employee is entitled as a reasonable accommodation to be reassigned to another position, even if there are better qualified applicants. One group of courts, lead by the Seventh

Circuit, reads the ADA's reassignment language to require employers to remove obstacles to hiring the best applicant for a job, whether disabled or otherwise.  EEOC v. Humiston-Keeling, Inc., 227 F.3d 1024, 1028-29 (7th Cir. 2000).  These courts oppose any other interpretation because they conclude that "the ADA is not an affirmative action statute."  Huber v. Wal-Mart Stores, Inc., 486 F.3d 480 (8th Cir. 2007).  These courts would, therefore, find a reassignment to a vacant position to be unreasonable, particularly if reassignment would violate a facially neutral non-discriminatory policy, such as a seniority policy.  Humiston-Keeling, 277 F.3d at 1027-29; EEOC v. Sara Lee Corp., 237 F.3d 349, 354 (4th Cir. 2001) ("[employee] has no statutory right to supercede Sara Lee's seniority system"); Huber, 486 F.3d at 483.  See also Daugherty v. City of El Paso, 56 F.3d 695, 700 (5th Cir. 1995) ("We do not read the ADA as requiring affirmative action in favor of individuals with disabilities, in the sense of requiring that disabled persons be given priority in hiring or reassignment over those who are not disabled.  It prohibits discrimination against qualified individuals with disabilities, no more and no less.").

Other courts, guided by the Court of Appeals for the District of Columbia Circuit and the Court of Appeals for the Tenth Circuit, read the ADA's "reassignment" language differently.  42 U.S.C. § 12111(9)(B).  In Aka v. Washington Hosp. Center, 156 F.3d 1284 (D.C. Cir. 1998) (en banc), a majority of

the en banc court held that "the word 'reassign' must mean more than allowing an employee to apply for a job on the same basis as anyone else." Aka, 156 F.3d at 1304. See also Alston v. Washington Metropolitan Area Transit Auth., No. 07-122, 2008 U.S. Dist. LEXIS 95781, at *9-10 (D.D.C. Aug. 12, 2008) ("[T]he reassignment provision imposes some affirmative duty on the employer to find a position for an employee who has become disabled on the job. To find that this duty is excused by an employer's policy of hiring the most qualified candidate would be to hold that the employer's obligation to a disabled employee is limited to considering him along with every other applicant for the vacant position."); Thornton v. Providence Health Sys., No. 05-40, 2005 U.S. Dist. LEXIS 36685, at *12 (D. Or. Dec. 5, 2005) ("Reassignment means that the employee gets the vacant position if s/he is qualified for it. Otherwise, reassignment would be of little value and would not be implemented as Congress intended.") (quoting EEOC guidelines).

The Tenth Circuit in Smith v. Midland Brake, Inc., 180 F.3d 1154 (10th Cir. 1999) built upon the reasoning of the Aka majority, explaining that a narrow reading of the word "reassignment" would make the word redundant because the ADA already provides protection from discrimination during the hiring process. Midland Brake, 180 F.3d at 1164-65; see also 42 U.S.C. §§ 12111(9)(B), 12112. The court in Midland Brake goes further by stating "[t]he statute does not say 'consideration of a

23

reassignment to a vacant position' may be a reasonable accommodation, it 'include[s] "reassignment" to a vacant position.' " <u>Id.</u> at 1164. <u>Aka</u> and <u>Midland Brake</u>, therefore, suggest strongly that the "reassignment" language of the ADA requires that a disabled employee be placed in a better position than other applicants, but they do not describe how much better a position or in what instances the employee should enjoy this benefit. This leaves the question of whether an employer must reassign a disabled employee or whether the employee should be favored only in certain circumstances or to a certain degree.

While declining to directly rule on the issue of what the ADA requires from an employer in a reassignment case, the court in <u>Aka</u> analyzed the legislative history and other court decisions that addressed the issue. <u>Aka</u>, 156 F.3d at 1304-06. Specifically, the court in <u>Aka</u> noted that

> [a]lthough the legislative history does warn against "preferences" for disabled *applicants*, it also makes clear that reasonable accommodations for existing *employees*, who become disabled on the job do not fall within that ban. Had Congress intended that disabled employees be treated exactly like other job applicants, there would have been no need for the report to go on to explain that "'bumping' another employee out of a position to create a vacancy is not required," and that "if a collective bargaining agreement reserves certain jobs for employees with a given amount of seniority, it may be considered as a factor in determining whether it is a reasonable accommodation to assign an employee with a disability without seniority to

the job;" there would have been no danger that an employee would be "bumped," or that a job would go to a disabled employee with less seniority.

Aka, 156 F.3d at 1304-05 (internal citations omitted).

The Aka court also noted that an employer is not required to assign a disabled employees to a position: (1) for which he is not otherwise qualified; (2) if the reassignment would be an undue hardship on the employer's business operations; (3) if no vacant position exists; (4) if a position must be created for the employee; or (5) if the position desired is currently occupied ("bumping"). Id. at 1305. In a footnote, the court further reasoned that "[t]he ADA's reasonable accommodation requirement treats disabled and non-disabled employees differently in a number of other respects. Among the accommodations it lists are "job restructuring," "part-time or modified work schedules," "training materials or policies," and "the provision of qualified readers or interpreters." Id. at 1305, n.29 (citing 42 U.S.C. § 12111(9)(b)).

The majority in Aka then analyzed decisions from other circuits and noted that "the courts that have said that the ADA does not permit 'preferences' in awarding jobs to the disabled have generally said so in the course of rebuffing requests which would have been especially disruptive to the employer's ordinary operations." Id. at 1304. This language, along with the "undue hardship" language noted above, provides the crux of Defendant's argument that an established, facially neutral policy

of hiring the best qualified applicant for a position relieves Defendant of any liability for failing to reassign Plaintiff.

The Third Circuit's Shapiro decision and its progeny appear to be more in keeping with the District of Columbia Circuit and the Tenth Circuit by focusing the analysis back to what type of accommodation is reasonable in light of all of the facts and circumstances. Shapiro, 292 F.3d at 361; Johnson v. McGraw-Hill Companies, 451 F. Supp. 2d 681, 708-709 (W.D. Pa. 2006); Tish v. Magee-Women's Hosp. of Univ. of Pittsburgh Med. Center, 2008 WL 4790733 (W.D. Pa. 2008) (Rehabilitation Act analysis). Indeed, in Shapiro, the court did not weigh in on whether an employer was required to reassign an employee as an accommodation, but instead explained that if an employee demonstrates that reassignment is a type of accommodation that is reasonable in the run of cases, an employer has the burden of showing that granting the requested accommodation would "impose an undue hardship under the particular circumstances of the case." Shapiro, 292 F.3d at 361. Upon consideration, we conclude that Plaintiff has satisfied his burden of showing that reassignment has, in a number of cases, been found to be a reasonable form of accommodation, and we thus find that for purposes of summary judgment, Plaintiff has satisfied his initial burden.

Turning to the secondary issue of whether reassignment would "impose an undue hardship," we do not find that Defendant has demonstrated that it is entitled to prevail on summary judgment. In fact, Defendant did not address the question of whether reassignment would impose an undue burden on its operations, but instead argued a more absolute view of the law, insisting that case law from other circuits suggests that it was never *required* to reassign Plaintiff, and that any such reassignment or preferential treatment would have violated the company's disability-neutral policy of hiring only the most qualified applicants. Because we conclude that reasonable accommodations under the ADA can require some consideration of job reassignment, and we further find that Defendant at this time simply has not shown that hiring Mr. Haynes into another open position, even one where there were other applicants who may have been better qualified, would have imposed an undue hardship upon the employer, we conclude that a judgment for the Defendant as a matter of law is not warranted at this time.[8]

---

[8] We pause to observe that the evidence on which Defendant relies in support of its general contention that Plaintiff was not the most qualified applicant for any position to which he applied is especially limited. For example, Defendant substantiates its assertion on this issue by pointing to the Plaintiff's own speculative testimony during his deposition when he was asked whether he believed he was the best qualified applicant. (SUF ¶ 56.) Defendant also relies upon Kyle Mundis's testimony that AT&T Mobility has a long-standing policy of hiring only the most qualified applicants, (SUF ¶ 54), but is quick to add that Mundis had no involvement in the decisions not to hire Plaintiff for any of the

Defendant suggests that the Supreme Court's decision in U.S. Airways v. Barnett dictates that a facially-neutral seniority policy always defeats a reassignment claim. (Def. Br. Sup. Sum. J. at 23-24, n.11.) Defendant further suggests that the Third Circuit's Shapiro decision extends this analysis to all facially-neutral policies. (Id.) We do not read Barnett so broadly, and we do not agree that Shapiro interpreted Barnett as broadly as Defendant suggests. Indeed, the court in Shapiro, guided by the Barnett decision, set out the two-part test for reassignment claims discussed above, pursuant to which an employee bears the burden of demonstrating that reassignment is reasonable in the run of cases, and then the defendant must come forward with evidence to show that reassignment would impose an undue hardship.

Furthermore, we do not agree that Barnett somehow articulated a rule that *any* disability-neutral policy will automatically relieve an employer from considering reassignment of an employee as a reasonable accommodation under the ADA, and particularly so where the employer has made no showing that such reassignment over

---

positions for which he applied, (SUF ¶ 55). Indeed, Mundis was candid in his testimony that he had little personal knowledge of why Plaintiff was not hired into various positions, other than to "speculate" and give his best assessment as to the reasons why Plaintiff might not have been hired. (SUF, Ex. B, Mundis Dep. at pp. 63-77.) Evidence that relies upon the employee's own speculation as to whether or not he was the best candidate, and on testimony from a supervisory employee who had no involvement in the decision not to hire Plaintiff, is of limited use in evaluating Plaintiff's qualifications for any of the positions to which he applied.

an unwritten policy of hiring the best candidates would impose undue hardship –

something the Third Circuit found to be required in <u>Shapiro</u>.[9]

Considering the evidence in the light most favorable to Plaintiff, we find that

there remain disputed issues of material fact as to whether reassignment to one of the

several vacant positions to which Plaintiff applied was a reasonable accommodation

under the facts and circumstances of this particular case.  In short, Defendant has

failed to identify any undue hardship that would befall AT&T Mobility if it were to

reassign Plaintiff to another position, notwithstanding the company's assertion of its

general policy of hiring only the most qualified applicants for any open position.

Accordingly, to the extent that the Defendant's motion is premised on an absolute

view of the ADA which essentially precludes any reassignment consideration as a

reasonable accommodation for an employee , we will recommend that Defendant's

motion for summary judgment be denied with respect to Plaintiff's claim that

---

[9] Notably, even in cases where an employee has not shown that accommodation in the form of reassignment is "reasonable in the run of cases," the employee can still prevail by showing that special circumstances warrant a finding that the accommodation is reasonable under the particular circumstances of the case." <u>Shapiro</u>, 292 F.3d at 361.  Given this cautionary guidance, and mindful that the reasonableness of particular accommodation is generally an issue of fact, we do not find that Defendant's contention regarding its policy of hiring only the most qualified applicants into its retail and other positions automatically defeats Plaintiff's claim of discrimination as a matter of law.

Defendant discriminated against him under the ADA by refusing to transfer him into another open position at or below his former position in the Harrisburg Call Center.

### b.     Reassignment Under the Facts of this Case

Defendant also argues that reassigning Plaintiff to another position within AT&T Mobility would have been an unreasonable accommodation.  Defendant's argument is predicated on its asserted understanding that what Plaintiff sought was simply a "less stressful" job than the one he had in the call center, and Defendant notes that the Third Circuit has held that such requests are unreasonable as a matter of law.  In this regard, Defendant refers the Court to Gaul v. Lucent Technologies, Inc., 134 F.3d 576 (3d Cir. 1998), in which a plaintiff had sought to be transferred away from co-workers who he contended were causing him "prolonged and inordinate stress" in the workplace.  Id. at 579.  The Third Circuit concluded that such a request was unreasonable as a matter of law, and explained that:

> [The plaintiff's] proposed accommodation would impose a wholly impractical obligation on AT&T or any employer. Indeed, AT&T could never achieve more than temporary compliance because compliance would depend entirely on Gaul's stress level at any given moment.  This, in turn, would depend on an infinite number of variables, few of which AT&T controls. Moreover, the term "prolonged and inordinate stress" is not only subject to constant change, it is also subject to tremendous abuse.  The only certainty for AT&T would be its obligation to transfer Gaul to another department whenever he becomes "stressed out" by a

coworker or supervisor. It is difficult to imagine a more amorphous "standard" to impose on an employer.

Id. at 581. Additionally, the court found that Gaul's proposed accommodation would impose excessively high administrative burdens on his employer, and because the plaintiff's requested accommodation was essentially an improper request that the courts "establish the conditions of his employment, most notably, with whom he would work." Id. See also Taylor, 184 F.3d at 316 n.7 ("[An] employee's proposed accommodation, a transfer whenever he decided he was stressed, [is] unreasonable as a matter of law."); Cobb v. Phila. Gas Works, No. 01-4937, 2004 U.S. Dist. LEXIS 6685, at *28 (E.D. Pa. March 31, 2004) ("Defendant argues that a move to a less stressful work environment is not a cognizable accommodation under the ADA. Defendant is correct.").

On the basis of these authorities, Defendant contends that Plaintiff's efforts to secure a position that would present him with a less stressful environment is not a reasonable accommodation. At first blush, Defendant's argument appears to be unassailable as a general statement of the law. However, in this case, Defendant in fact took a number of steps to determine whether Plaintiff's medical needs could reasonably be accommodated, by repeatedly seeking out "peer reviews," in which one treating physician, and doctors reviewing Plaintiff's file, indicated to the company

that Plaintiff required a less stressful environment as an accommodation. One of these medical peer reviews provided the Defendant with a specific way of removing one medically defined stress factor from the job duties of the Plaintiff by reassigning the Plaintiff to a retail customer service setting. On the basis of these reviews, which Defendant itself solicited, Defendant reached the unilateral conclusion that could Plaintiff no longer work in the call center, with or without accommodation, and invited Plaintiff to seek other opportunities within the company.

Furthermore, we note that in the initial peer review that Defendant elected to obtain, Dr. Chagnon concluded that Plaintiff could, in fact, continue to work in the call center with or without further accommodation. When Defendant sought yet further medical guidance, Dr. Goldman did not merely say that Plaintiff required a "less stressful" position, but actually attempted to provide specificity to the concededly nebulous "less stressful" recommendation by explaining that it would be medically beneficial if Plaintiff could be relieved from having to interact with customers over the telephone. Thus, we find that the record in this case is distinguishable from that presented in Gaul, where the plaintiff was actively seeking a transfer only on the basis that co-workers caused him stress, and the Third Circuit found such an amorphous request to be unreasonable as a matter of law. In this case, the medical guidance that *Defendant* solicited – and may not have shared with

Plaintiff – ultimately provided far more specificity than merely a transfer to a "less stressful" job, which we would be constrained to agree is an unreasonable accommodation following <u>Gaul</u>.

In this case, Defendant was advised that taking inbound calls was a specific factor that exacerbated Plaintiff's medical condition and disability by heightening Plaintiff's stress levels, and it was recommended that he be accommodated by being relieved from taking such calls. That is far different than the wholly subjective and amorphous guidance Gaul provided his employer, where he sought transfer simply because certain of his co-workers caused him stress or anxiety. Indeed, Defendant itself acted upon the medical advice that it now contends was hopelessly vague by determining, on its own, to remove Plaintiff from his job in the call center, and Michele Grounds testified that this decision was made after considering factors that included not only Plaintiff's desire for a different position and his efforts to reduce stress, but also the "big factor" that Dr. Goldman "didn't want him taking incoming calls . . . ." (SUF, Ex. E, Grounds Dep. at 70.) Taking the evidence in the light most favorable to the Plaintiff, we conclude that there remain disputed issues of material fact as to whether Defendant acted reasonably in response to Plaintiff's requests to be accommodated when it elected to remove Plaintiff from his job in the call center and place him on administrative leave, and whether Defendant's mere invitation to

allow Plaintiff to apply for other positions, including jobs that would have relieved

him from answering inbound calls from customers, was reasonable under the facts of

this case.[10]

---

[10] Relatedly, we conclude that there remains a question as to whether
Defendant reasonably participated in the interactive process mandated by the ADA
when, after considering the peer reviews that it solicited from outside medical
professionals and Dr. Goldman's follow-up guidance, the company unilaterally
concluded that Plaintiff could not be accommodated in the call center and should
be placed in a 30-day job search on equal footing with other applicants. In Taylor,
the Third Circuit noted that "[t]he interactive process would have little meaning if
it was interpreted to allow employers, in the face of a request for accommodation,
simply to sit back passively, offer nothing, and then, in post-termination litigation,
try to knock down every specific accommodation as too burdensome. That's not
the proactive process intended: it does not help avoid litigation by bringing the
parties to a negotiated settlement, and it unfairly exploits the employee's
comparative lack of information about what accommodations the employer might
allow. In addition, in some cases courts may be better positioned to judge whether
the employer met with the employee in good faith than to judge how burdensome a
particular accommodation really is." Taylor v. Phoenixville Sch. Dist., 184 F.3d at
315-16. Furthermore, by simply discontinuing Plaintiff's work in the call center
and inviting him to apply for other jobs on an equal basis with other job seekers, it
is not clear that Defendant complied adequately with its obligation to participate in
the interactive process. See, e.g., Mengine, 114 F.3d at 420 ("[E]mployers will not
always know what kind of work the worker with a disability can do, and
conversely, the worker may not be aware of the range of available employment
opportunities, especially in a large company. Thus, the interactive process may
often lead to the identification of a suitable position."). To be sure, we do not
conclude from the record before the Court that AT&T Mobility violated its
obligation to participate meaningfully in the interactive process, and we note that
Plaintiff was apparently granted some access to internal job postings, and Kyle
Mundis testified that he brought one position specifically to Plaintiff's attention.
Nevertheless, we conclude that there remain unsettled questions of fact that bear
upon the ultimate resolution of this issue, including Defendant's efforts to
investigate steps that might have been taken to reassign Plaintiff to another open

In reaching this conclusion we wish to emphasize the narrowness of our recommendation. While we recognize that the ADA may not compel broad affirmative action policies, we also find that courts may not adopt an absolute view and conclude that work reassignment never qualifies as a reasonable accommodation under the ADA. Rather, such requests should be assessed under the deferential two-part test articulated by the court of appeals in <u>Shapiro</u>. Further, in this case where the Defendant's medical review identified a specific form of reassignment that could accommodate Plaintiff's disability, there exist factual issues which on the present, incomplete, record preclude summary judgment on Plaintiff's reassignment claim.

### 2.      **The Plaintiff's Other Requested Accommodation Claims Fail**

In addition to the failure to reassign claim discussed above, Plaintiff also alleged that Defendant failed to accommodate his need to work in close proximity to the bathroom.  (Compl. ¶ 90.)  Defendant argues that Plaintiff failed to identify his requested accommodation with sufficient specificity to allow for Defendant to provide a proper accommodation.  Unlike Plaintiff's reassignment claim discussed above, with respect to this claim, we agree that Plaintiff refused improperly to engage meaningfully in the interactive process, leaving his employer literally to guess at what

---

position within the company for which he was qualified, that are properly reserved for trial.

proximity to the bathroom would be reasonable and necessary under the circumstances. As we noted above, when determining specific reasonable accommodations requested by an employee as necessitated by his medical needs, employees and employers must engage in an interactive process to define the scope of the accommodation, and to determine whether such an accommodation is feasible and reasonable. 29 C.F.R. § 1630.2(o)(3); see Mengine v. Runyon, 114 F.3d 415 (3d Cir. 1997). Here, Defendant notes that at no point did Plaintiff specify exactly how close he needed to be to the restroom so as to be able to make it to the bathroom without soiling himself. Plaintiff claims that it is impossible to provide a specific distance, and that the proper distance can be found through "trial and error." (SUF, Ex. A, Haynes Dep. p. 143). This is little more help than Plaintiff's 2005 medical evaluation in which his doctor advised, ambiguously, that he should be "situated near a restroom, but not overtly close as to cause embarrassment." (SUF ¶¶ 32-33.) AT&T Mobility quite reasonably followed up on this vague guidance by asking Plaintiff for greater specificity to assist the company in properly placing him within the call center. (Id. ¶ 34.) Plaintiff declined to provide the company with any further guidance as to what he believed would be necessary to accommodate his medical needs with respect to bathroom proximity, and we conclude that his failure to do so relieves Defendant from any possible liability under the ADA for failing to

accommodate a request that Plaintiff himself either could not, or would not, clarify for his employer.  See Taylor, 184 F.3d at 317 ("[A]n employer cannot be faulted if after conferring with the employee to find possible accommodations, the employee then fails to supply information that the employer needs or does not answer the employer's request for more detailed proposals.").  Because Plaintiff failed to satisfy his own obligation of participating in the interactive process with respect to his request for seating proximate to a restroom, we recommend that summary judgment be granted in favor of Defendant on this aspect of Plaintiff's ADA discrimination claim.[11]

We also find that Defendant is entitled to summary judgment with respect to Plaintiff's claim that by failing to provide him with the motorized desk that he used in California, opting instead to furnish him with an adjustable keyboard stand, Defendant discriminated against him.  As with his claim regarding restroom proximity, Plaintiff has failed to address Defendant's arguments regarding this aspect of his claim in his brief.

Although it is clear that the adjustable keyboard stand was not Plaintiff's ideal choice, the ADA does not require that an employer provide the perfect or even the

---

[11]  Moreover, we note that Plaintiff failed to address this claim, and Defendant's argument in support of summary judgment concerning restroom proximity, in his brief opposing summary judgment.

ideal, but that it provide a reasonable accommodation. See, e.g., Mastronicola v. Principi, No. 04-1655, 2006 U.S. Dist. LEXIS 78879, at *15 (W.D. Pa. Oct. 30, 2006) (in order to overcome summary judgment, "there must be a genuine issue of material fact that the [employer's] offer was *unreasonable*, not just that it was not *ideal*") (original emphasis). There is no dispute that Plaintiff was provided with an adjustable keyboard that was made available to other employees who sought an accommodation of being able to stand while working. (SUF ¶¶ 25-26.) We do not find that Plaintiff has adduced sufficient evidence to support his initial contention that Defendant's election to make available to him an adjustable desk – albeit a manual one – was an unreasonable accommodation. For this reason, and because Plaintiff has failed to address this claim on summary judgment, we will recommend that the Court grant Defendant's motion for summary judgment with respect to this aspect of Plaintiff's discrimination claim.

### C.    Plaintiff's Retaliation Claim Fails

Plaintiff claims that Defendant unlawfully retaliated against him for engaging in protected conduct in violation of the ADA. Defendant claims it is entitle to summary judgment because Plaintiff has failed to identify a causal link between his protected conduct and his adverse employment action.

The ADA prohibits retaliatory conduct against an employee when the employee either opposes illegal conduct (opposition clause) or participates in any proceedings regarding a claim of discrimination (participation clause). 42 U.S.C. § 12203(a).[12] The parties seem to disagree as to which of Plaintiff's actions constitutes the alleged protected activity under the anti-retaliation provision of the ADA, 42 U.S.C.. § 12203(a). If we analyze Plaintiff's alleged protected conduct, his discussions with a diabetic coworker about her potential ADA rights, we would, presumably, be analyzing the claim under the participation clause for assisting a coworker to obtain ADA assistance or the opposition clause as opposing some denial of the coworker's rights. If we analyze the Defendant's alleged protected conduct, Plaintiff's filing of a claim with the EEOC, we would analyze the claim under the opposition clause. For the reasons discussed below, Plaintiff's claims fail with regard to both possible protected actions, and Defendant should be granted summary judgment on Plaintiff's claim for retaliation.

Claims of retaliation under the ADA are subject to the same analysis as Title VII claims of retaliation. Krouse v. American Sterilizer Company, 126 F.3d 494 (3d

---

[12] This Court has previously observed that ADA, Title VII, and PHRA are "governed by the same set of precedents." Smith v. ABF Freight Systems, 2007 WL 3231969 (M.D. Pa. 2007) (citing Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567-68 (3d Cir. 2002)).

Cir. 1997). To establish a *prima facie* claim of disability retaliation, Plaintiff must show that: (1) he engaged in an activity protected by the ADA; (2) the employer took a "materially adverse" employment action; and (3) a causal connection exists between the employee's protected activity and the adverse employment action. Flax v. Delaware, 329 Fed. App'x 360, 364 (3d Cir. 2009) (citing Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006)).

We turn first to Plaintiff's claim that his action of informing a coworker of her rights under the ADA qualifies as a protected activity for purposes of ADA protection. We conclude that it does not, and Plaintiff has failed to satisfy the first prong of a *prima facie* case of retaliation. To be protected under the opposition clause, Plaintiff must show that he "opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12203(a). Plaintiff seems to claim that he opposed some unspecified, and allegedly unlawful, denial of his coworker's rights, yet he offers no evidence of any unlawful activity or practice to which opposition would be protected. Further, Plaintiff fails to show that he "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." Id. Plaintiff has not pointed to any proceeding of any kind regarding conduct made unlawful under the statute, and thus we find that he has failed to adequately support his claim for retaliation under the ADA.

Although Plaintiff ignores the issue in his briefs, we turn next to the claim addressed by Defendants that Plaintiff was terminated due to his EEOC filing in April, 2007. Filing a charge with the EEOC is generally considered a protected activity under the ADA. Sampson v. Sch. Dist. of Lancaster, 2009 WL 1675083, *5 n.7 (E.D. Pa. 2009) (citing Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 287-88 (3d. Cir. 2001). Plaintiff's adverse employment action, however, took place almost a full year later, on March 27, 2008. (SUF ¶¶ 71, 73.) For the timing of an adverse employment action to demonstrate a causal link between the protected activity and the adverse action, the timing must be "unusually suggestive" of retaliatory motive. Krouse, 126 F.3d at 503 (internal citations omitted). Here, Plaintiff has not offered any evidence that would causally link his EEOC filing and his termination, nor has he rebutted Defendant's proffered reason for terminating him. Because he cannot make out a *prima facie* case of retaliation, we conclude that his claim fails as a matter of law, and we will recommend that the Court grant Defendant's motion on this claim.

## IV.   RECOMMENDATION

For the reasons set forth above, it is hereby RECOMMENDED that the Court GRANT Defendant's Motion for Summary Judgment (Doc. 15) with respect to Plaintiff's retaliation claims and Plaintiff's claim that Defendant discriminated against

him with respect to the provision of an adjustable desk and proximity to restroom facilities.  It is further recommended that the Court DENY Defendant's motion for summary judgment with respect to Plaintiff's claim that Defendant discriminated against him by failing to accommodate his medical needs by reassigning him to another position with the company for which he was qualified, but deny this motion without prejudice to the parties further addressing this issue in light of our recommendation regarding the threshold legal issue of whether, and under what circumstances, a reassignment may qualify as a reasonable accommodation.

The parties are further put on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified  proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall

witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 17th day of November, 2010.

*S/Martin C. Carlson*
**United States Magistrate Judge**